UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GURSEWAK SINGH AULAKH,<br><br>                    Plaintiff,<br><br>          v.<br><br>7-ELEVEN, INC., and DOES 1<br>through 30, inclusive<br><br>          Defendants. | 01:04-CV-06151 OWW LJO<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART<br>DEFENDANT/COUNTERCLAIMANT'S<br>MOTION FOR SUMMARY JUDGMENT<br>(DOC. 19) |

## I.   INTRODUCTION

This is a contract dispute between 7-Eleven, Inc. ("7-Eleven" or Defendant) and Gursewak Singh Aulakh (Plaintiff or "Aulakh"), a former 7-Eleven franchisee.   In 1999, Plaintiff entered into a Franchise Agreement with 7-Eleven to operate a 7-Eleven franchise in Lamont, California.   In December 2003, Plaintiff and 7-Eleven began to discuss the possible termination of the Franchise Agreement.   In February 2004, Plaintiff and his business partner entered into a Sales Contract for the purchase of the Lamont property.   At the closing on this Sales Contract, Plaintiff signed a Rider, which purports to terminate all of Plaintiff's rights under the Franchise Agreement.   Plaintiff also signed a mutual Release which releases both the parties from all

1

1  claims and liabilities existing as of that date, with some

2  limited exceptions, including a provision concerning the

3  reconciliation of the financial records at the store.

4      Plaintiff filed suit against 7-Eleven in the Superior Court

5  for the County of Kern on July 15, 2004, setting forth various

6  claims for breach of contract and rescission. (Doc. 1, Notice of

7  Removal, Ex. 1, filed Aug. 27, 2004.) The first cause of action

8  alleges that 7-Eleven breached the terms of the Franchise

9  Agreement by terminating Aulakh as a franchisee without

10 satisfying the conditions of the Franchise Agreement. (*Id*. at

11 ¶¶5-14.) The second cause of action alleges that 7-Eleven

12 breached the Franchise Agreement by refusing to refund any

13 portion of the franchise fee paid by Plaintiff and by refusing to

14 allow Plaintiff to transfer to another 7-Eleven store. (*Id*. at

15 ¶¶15-20.) The third claim alleges that Plaintiff breached the

16 Sales Contract by removing the existing gasoline canopy from the

17 Premises. (*Id*. at ¶¶21-23.) The fourth cause of action is for

18 rescission of the Rider and Release on the grounds that

19 Plaintiff's consent was obtained through duress. (*Id*. at 28-33.)

20     Defendant removed on the basis of diversity (Doc. 1), and

21 filed two counterclaims. (Doc. 8, filed Dec. 2, 2004.) The

22 first counterclaim is for setoff in the amount of $6,922.35, the

23 amount 7-Eleven claims Aulakh was indebted to 7-Eleven based on

24 the final financial reconciliation of the store. The second

25 counterclaim alleges that Aulahk breached the franchise agreement

26 by failing to pay 7-Eleven the $6,922.35 net worth deficiency

27 from the store.

28     7-Eleven now moves for summary judgment on all claims,

**2**

arguing (1) that the Rider and Release entitles 7-Eleven to judgment on Plaintiff's breach of contract and rescission claims and (2) that there is no dispute that Plaintiff owes 7-Eleven $6,922.35.  Plaintiff, who filed papers related to the present motion pro se, opposes summary judgment, asserting that he signed the Rider and Release under duress and that there are disputed facts regarding the accounting that forms the basis for 7-Eleven's counterclaims.  Oral argument was heard on November 7, 2005.

In his opposition and at oral argument, Plaintiff requested additional time to have his accountant and a lawyer analyze his financial records so that he could more effectively contest 7-Eleven's demand for $6,922.35.  The court ordered Plaintiff to have his attorney enter an appearance within 24 hours of the hearing. (*See* Doc. 30.)  Indira Lahiri, Esq. timely entered his appearance for Plaintiff.  A telephonic status conference was held on December 1, 2005, at which time Plaintiff was granted until December 15, 2005 to file any supplemental opposition to the motion for summary judgment. (Doc. 36.)  Plaintiff failed to file any supplement.

## II.  <u>FACTUAL BACKGROUND</u>

On March 16, 1999, Plaintiff entered into a Franchise Agreement with 7-Eleven to operate a 7-Eleven store in Lamont, California.  (UMF No. 1.)  During the course of Plaintiff's tenure as a franchisee, Plaintiff was consistently one of the lowest performers in his sales district.  (Austin Decl. ¶3.)  In

1    December 2003, Michael Austin, 7-Eleven's Market Manager, and

2    David Lisuk, a Field Consultant, met with Plaintiff to discuss

3    the several possible options to terminate the Franchise

4    Agreement.  (*Id*. at ¶4.)  At this meeting, Austin apparently

5    informed Plaintiff that, before 7-Eleven would agree to any

6    resolution, Plaintiff would have to sign a mutual release.  (*Id*.)

7         Ultimately, Plaintiff offered to purchase the store property

8    so that he could run the business as an independent franchise.

9    (*Id*. at ¶5.)  Mr. Austin negotiated this transaction on behalf of

10   7-Eleven.  The parties eventually signed three documents: (1) a

11   Sales Contract transferring the real property to Mr. Aulakh (2) a

12   Rider to the Sales Contract ("Rider"), and (3) a Mutual

13   Termination and Release ("Release").

14        Among other terms, the Rider provides:

15             Pursuant to the termination of the Franchise Agreement,
               Aulakh acknowledges that, except as provided herein,
16             all of Aulakh's rights under the Franchise Agreement
               are terminated, including, but not limited to, any
17             rights to renewal of transfer of the franchise, refund
               of all or any portion of the franchise fee paid by
18             Aulakh, any rights granted under the Long-Term Tenure
               Rebate Program or any other program offered by 7-
19             Eleven.  Aulakh will no longer be a 7-Eleven franchisee
               at any location following the Termination Date and will
20             receive no compensation other than what is described in
               this Agreement.

21
     (*Id*. at Ex. E ¶6.)
22
          The Release provides in pertinent part:
23

24             1.   7-Eleven, Inc. ("7-Eleven") and the undersigned
                    individual(s) (the "Franchisee") hereby mutually
25                  agree that, under that certain 7-Eleven Store
                    Franchise Agreement between the undersigned
26                  parties, dated march 16, 1999, as amended (the
                    "Agreement") and terminated effective 6:45 a.m. on
27                  April 15, 2004, and which covered 7-Eleven Store
                    no. 25955C (the "Store"), except as specifically
28                  provided in Paragraphs 8 and 9 hereof, ALL claims,

demands, rights, duties, guarantees, obligations, debts, dues, sums of money, accounts, covenants, contracts, controversies, assignments, suits or causes of action (collectively, the "claims") of every kind and nature, however, or wherever arising, whether known or unknown, foreseen or unforeseen, direct, indirect, contingent or actual, liquidated or unliquidated, which have arisen or which might or could arise under Federal, state, or local law from any relationship, incident, or transaction arising or occurring under the Agreement or under any agreement in connection therewith, or from the execution, operation under or termination of the Agreement, and any services to the franchisee thereunder or under any prior agreement relating to the Store, existing or arising at any time prior to or at the time of the execution hereof, are hereby <u>mutually satisfied, acquitted, discharged and released</u> by Franchisee and 7-Eleven, it being the express intention of Franchisee and 7-Eleven that this release be as broad as permitted by law.

2.    Franchisee intends this release to acquit and forever fully discharge 7-Eleven and any parent and direct or indirect subsidiary thereof, any division, affiliate, and its and their respective officers, directors, shareholders, partners, agents, employees, heirs, legal representatives, successors and assigns.

3.    Franchisee and 7-Eleven represent and warrant that execution hereof is free and voluntary and that no inducements, threats, representations, or influences of any kind were made or exerted by or on behalf of either party.

                    * * *

8.    NOTWITHSTANDING ANY OF THE FOREGOING, THIS RELEASE DOES NOT INCLUDE:

                    * * *

(b)   any amounts to either party (the "Final Settlement") as reflected on the final Financial Statements prepared by 7-Eleven.

(*Id.* at Ex. F. (emphasis added).)

Among other provisions, the Sales Contract contained terms

**5**

concerning the removal of gasoline equipment:

>    14.   Removal of Motor Fuels Equipment and Testing
>
>>    Seller has commenced work to remove the Motor
>>    Fuels Equipment located on, about or under the
>>    Property.  Seller agrees that the gasoline canopy
>>    will remain in place at the Property provided that
>>    it does not interfere with the removal of the
>>    Motor Fuels Equipment.  Seller estimates that the
>>    removal, testing and procuring of test results
>>    should be completed on or before April 30, 2004.
>>    In connection with the removal of the Motor Fuels
>>    Equipment, Seller will perform such soil and/or
>>    groundwater tests as Seller deems appropriate, and
>>    upon request from Buyer will provide Buyer with
>>    the results thereof.  If the results of such tests
>>    and/or assessments reveal that there is no
>>    contamination, then the parties shall proceed with
>>    the Closing.  If, however, such tests reveal
>>    contamination, Seller shall initiate and complete,
>>    at its cost and expense, certain remedial measures
>>    as required by the appropriate authorities.  In
>>    this instance, the parties may proceed to Closing
>>    provided that a mutually-acceptable Access
>>    Agreement is executed at the Closing.

(Sales Contract at ¶14.)  Prior to closing, Plaintiff was aware that 7-Eleven had already removed its gas canopy at the store. Plaintiff also acknowledged that he knew prior to the closing that 7-Eleven intended to terminate the Franchise Agreement and did not intend to permit Aulakh to transfer to another 7-Eleven store.  (Aulakh Depo. at 110, 139.)

After the closing, 7-Eleven reconciled the financial records of the Lamont Store.  As a result, 7-Eleven asserts Plaintiff owes 7-Eleven $6,922.35.  (Austin Decl., ¶12, Ex. G.)

Mr. Austin maintains that it is his practice to provide copies of all documents in advance to any franchisee with whom he is negotiating a deal.  Mr. Austin recalls having provided Mr. Aulakh copies of a draft of the Sales Contract, the Release, and the Rider, prior to closing.  Mr. Aulakh maintains that he was

first informed that 7-Eleven would require a Release at the Closing.  According to Mr. Aulakh, Mr. Austen stated that "they would not close escrow unless I signed a release document, and that if I did not sign the release document they would sell the property to somebody else who they had available, and thereby they put great pressure and duress upon me to sign the settlement agreement." (Aulakh Decl. at ¶6.)  Mr. Aulakh "had no lawyer or financial adviser representing [him] or helping [him] negotiate this transaction with 7-Eleven."  (*Id.* at ¶9.)

### III.   <u>STANDARD OF REVIEW</u>

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material.  *Id.*  A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  The evidence must be viewed in a light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL

7

1490998 (9th Cir. 2001).  Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp.*, 68 F.3d at 1221.  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all

other facts immaterial.
*Celotex Corp.*, 477 U.S. at 322-23.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249). If the moving party can meet his burden of production, the non-moving party "must produce evidence in response....[H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby, Inc.*, 477 U.S. at 255. A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to find genuine factual issues. *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

**IV.   ANALYSIS**

### A.   <u>Are Aulakh's Breach of Contract Claims Barred by the Rider and Release</u>?

7-Eleven argues that all of Aulakh's claims, based upon the Franchise Agreement, are barred by the Rider and Release.  Aulakh does not challenge the potential effect of the language in the Rider and Release.  Rather, Aulakh maintains that he signed the Rider and Release under duress and should therefore be relieved from their operation and effect

It not disputed that on April 15, 2004, Plaintiff signed the Release and Rider, the terms of which are also undisputed.  There is also no dispute that, absent any reason to invalidate the release agreement, written releases are enforceable under California law.  *See* Cal. Civ. Code § 1541 ("An obligation is extinguished by a release therefrom given to the debtor by the creditor, upon a new consideration, or in writing, with or without new consideration.").

### B.   <u>Facts Applicable to Mr. Aulakh's Claim of Duress.</u>

Mr. Aulakh maintains that he signed the contracts under duress and presents his own deposition and declaration in support of this contention.  First, Mr. Aulakh asserts that he was not provided copies of the Rider and Release prior to the closing date.  (Aulakh Decl. at ¶6.)  Mr. Austen disputes this assertion and recalls that he did indeed deliver drafts of these documents to Mr. Aulakh.  (Austin Decl. at ¶10.)  7-Eleven provides no documentary evidence to support this contention, however.  Whether Mr. Aulakh possessed the documents in advance of the closing is in dispute.  Accordingly, the inference must be drawn

10

1  in favor of Mr. Aulakh's on this subject.

2      It is undisputed that Mr. Aulakh "had no lawyer or financial

3  adviser representing [him] or helping [him] negotiate this

4  transaction with 7-Eleven." (Aulakh Decl. at ¶9.)  Mr. Austen

5  maintains, however, that "at no point during the sales process

6  did Mr. Aulakh ask for more time to read the Sales Contract, the

7  Rider to the Sales Contract, or the Release, or to have an

8  attorney (or other advisor) review the documents on his behalf."

9  (Austin Decl. at ¶11.)

10      Mr. Aulakh also asserts that the circumstances of the

11  closing and Mr. Austen's conduct placed him under financial

12  duress.  According to Mr. Aulakh, Mr. Austen stated that 7-Eleven

13  "would not close escrow unless [Aulakh] signed a release

14  document, and that if [he] did not sign the release document they

15  would sell the property to somebody else who they had available,

16  and thereby they put great pressure and duress upon me to sign

17  the settlement agreement." (Aulakh Decl. at ¶6.)  Mr. Aulakh

18  further asserts that

19              The duress and corrosion [sic] were increased by the
              fact that I had already paid them between $30,000.00
20              and $35,000.00 for the closing of the store, and a
              transfer to 7-Eleven of the lottery equipment, food
21              stamps, and credit cards, and had purchased the ATM
              machines which were all in the store at the time.  I
22              therefore financially committed to buying the store and
              running the business and therefore I had no alternative
23              but to sign the release document, which I did under
              protest and under threat and with out [sic] my consent,
24              in order that I could continue with my lively hood
              [sic] by running a store at that location to provide
25              for myself and my family.

26
27  (Aulakh Decl. at ¶6.).  7-Eleven does not deny that Mr. Aulakh

28  might have felt financial pressure to sign the Release and rider.

**11**

Mr. Austin does deny ever using any force "either physically or otherwise" to convince Mr. Aulakh to sign the contracts. (Austin Decl. at ¶ 11).   Therefore, Mr. Aulakh's contention that he was under financial pressure to sign the documents is undisputed for the purposes of this motion.  The question remains, however, whether such financial pressure constitutes "duress" under California law.

   **C.   <u>The Record Does Not Support a Finding of Economic Duress</u>.**

   California recognizes two forms of duress that, under certain circumstances, may justify the invalidation of an otherwise valid agreement.  First, a court may invalidate an agreement where one party was subject to physical coercion.  *See* Cal. Civ. Code § 1569 (defining duress as unlawful or fraudulent confinement of the person or unlawful detention of property).  No physical coercion is alleged in this case.  Second, an agreement may be invalid if it is the result of economic coercion. Economic duress "may arise from an act that is so coercive as to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract." *Tarpy v. County of San Diego*, 110 Cal. App. 4th 267, 277 (2003) (internal quotations and citations omitted); *see also CrossTalk Prod., Inc. v. Jacobson*, 65 Cal. App. 4th 631, 644 (1998)("When a party pleads economic duress, that party must have had no reasonable alternative to the action it now seeks to avoid (generally, agreeing to a contract).  If a reasonable alternative was available, and there hence was no compelling necessity to submit

**12**

to the coercive demands, economic duress cannot be established."). To set aside a contract because of economic duress, a court must determine (1) that a coercive act took place; and (2) that the act left the party pleading duress with no "reasonable alternative" to the agreement.

A court may find a coercive act took place if the allegedly coercive party asserted "a claim known to be false" or made "a bad faith threat to breach a contract or to withhold a payment," *See Rich & Whillock, Inc., Ashton Develop.*, Inc., 157 Cal. App. 3d 1154, 1158-59 (1984)(citing other cases). "Whether the party asserting economic duress had a reasonable alternative is determined by examining whether a reasonably prudent person would follow the alternative course, or whether a reasonably prudent person might submit." *CrossTalk*, 65 Cal. App. 4th at 644. For example, "a reasonably prudent person...may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." *Rich & Whillock*, 157 Cal. App. at 1159.

Here, there is no evidence that 7-Eleven engaged in any conduct that constitutes a coercive act. It did not make a false claim or a bad faith threat. Moreover, even if 7-Eleven had engaged in a coercive act, Plaintiff has failed to present any evidence that suggests he had no "reasonable alternative" to the agreement. Mr. Aulakh asserts that he "already paid [7-Eleven] between $30,000.00 and $35,000.00 for the closing of the store, and a transfer to 7-Eleven of the lottery equipment, food stamps and credit cards, and had purchased the ATM machines which were all in the store at the time. I therefore financially committed

**13**

to buying the store and running the business...." (Aulakh Decl. at ¶ 6).

The possible loss of such sunk costs cannot, on its own, justify a finding that Mr. Aulakh had no "reasonable alternative to the agreement." For example, in *River Bank America v. Diller*, 38 Cal. App. 4th 1400 (1995), developers claimed to have reached a tentative joint venture agreement with a bank and complained that they had incurred development expenses and other obligations as a result. The bank then changed the terms of the joint venture agreement. Defendants claimed they executed the revised agreements under economic duress, because they had difficulty finding alternative financing. The court found those facts could not establish a defense based on economic duress. *Id*. at 1425.

Relying on *London Homes, Inc. v. Korn*, 234 Cal. App. 2d 233 (1965), the *River Bank* court concluded that a claim of economic duress requires more than mere proof that the opposing party takes a different view of its contract rights than the party claiming duress:

> [In *Korn*] the court held there was no "duress" or
> "business compulsion" as a matter of law, where a
> plaintiff voluntarily agreed to pay more for land than
> it had originally agreed. At the time the sellers
> demanded more money per acre than had originally been
> agreed in the deposit receipt, the buyer/plaintiff
> could have brought suit against them for damages, but
> for what seemed good business reasons, elected not to
> do so. Instead, the buyer/plaintiff paid the higher
> price, even though it was not required to do so. It is
> not duress to take a different view of contract rights,
> even though mistaken, from that of the other
> contracting party, and it is not duress to refuse, in
> good faith, to proceed with a contract, even though
> such refusal might later be found to be wrong. A mere
> threat to withhold a legal right for the enforcement of
> which a person has an adequate [legal] remedy is not
> duress.

**14**

*River Bank*, 38 Cal. App. 4th at 1425 (emphasis added)(internal citations and quotations omitted).  The *River Bank* court then concluded:

> This case falls squarely within the holding of *Korn*. Consequently, there was no "economic duress" upon which an estoppel can be based. If defendants believed they had in fact reached a "joint venture" agreement with River Bank, they could have immediately sued to enforce that agreement once River Bank reneged.

*Id.*

Mr. Aulakh's claim of duress, even viewing the disputed facts in a light most favorable to him, similarly fails to establish that he had "no reasonable alternative."  Rather than signing the agreement, Mr. Aulakh could have immediately sued to enforce the Franchise Agreement.  Nor was he forced to by the fixtures.  it was his choice to seek to continue in the convenience store business.  He does not suggest that 7-Eleven requires he do so.  There is nothing in the record that suggests this alternative was not available or would somehow be inadequate.  Mr. Aulakh has not provided evidence that he was on the brink of bankruptcy.


**D.  The Record Does Not Support a Finding of Unconscionability.**

As an alternative ground for invalidation of the agreements, Mr. Aulakh appears to suggest in his opposition brief that the terms of the Release are unconscionable.  (*See* Doc. 26 at 2:5; 5:10-19.)  There is no basis for a finding of unconscionability on the facts of this case.

The doctrine of unconscionability is codified in California Civil Code § 1670.5.  California jurisprudence recognizes that

the term "unconscionable" has "both a procedural and a substantive element, <u>both</u> of which must be present to render a contract unenforceable." *Indep. Ass'n of Mailbox Ctr. Owners, Inc. v. Superior Court (Mail Boxes, etc., USA, Inc.)*, 34 Cal. Rptr. 3d 659, 667-68 (2005)(emphasis added).

> The procedural element focuses on the <u>unequal bargaining positions</u> and <u>hidden terms</u> common in the context of adhesion contracts. While courts have defined the substantive element in various ways, it traditionally involves contract terms that are so one-sided as to "<u>shock the conscience</u>," or that <u>impose harsh or oppressive terms</u>.

*Id.* "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).[1]

As to the procedural component of unconscionability, the parties in this case arguably have unequal bargaining power. However, there is no evidence that the simple forms contained any "hidden terms." The waivers contained in the Rider and Release are obvious and straightforward.

Even if procedural unconscionability existed, there is absolutely no indication that any of the provisions of the contracts are substantively unconscionable. One example of a substantively unconscionable provision is a mandatory arbitration clause that gives an advantage to one party by virtue of the

---

[1]   California law recognizes that franchise agreements themselves "can have some characteristics of contracts of adhesion." *Mailbox Ctr. Owners*, 34 Cal. Rptr. 3d at 668. However, Mr. Aulakh claims that the terms of the Release and Rider, not the Franchise Agreement, are unconscionable.

place or manner in which the arbitration is to occur.  *See Bolter
v. Superior Court (Harris Research, Inc.)*, 87 Cal. App. 4th 900,
904 (2001).   The Release and Rider in this case operate as a
<u>mutual</u> release from liability, shielding <u>both</u> Mr. Aulakh and 7-
Eleven from liability.   There is nothing about these terms that
"shocks the conscience," nor are they "harsh or oppressive."


    **E.   The Legal Effect of a Valid Release and Rider**.

    The inquiry then turns to the effect of the Release and
Rider on Plaintiffs' claims.   Having determined that Plaintiff's
consent to the Release and Rider is not tainted by economic
duress or unconscionability, 7-Eleven is entitled to summary
judgment on Plaintiff's fourth cause of action for rescission of
the mutual release based on duress and unconscionability.   For
the remaining claims, the critical question is whether the
waivers contained within the agreements encompass any or all of
Plaintiff's complaints.

    The first cause of action alleges that 7-Eleven breached the
terms of the Franchise Agreement by terminating Aulakh as a
franchisee without satisfying the conditions of the Franchise
Agreement.   (*Id*. at ¶¶5-14.)   The second cause of action alleges
that 7-Eleven breached the Franchise Agreement by refusing to
refund any portion of the franchise fee paid by Plaintiff and by
refusing to allow Plaintiff to transfer to another 7-Eleven
store.   (*Id*. at ¶¶15-20.)

    Plaintiff is barred from pursuing either of these claims
because the Release terminates Plaintiff's rights under the
Franchise Agreement by providing in pertinent part:

1.   7-Eleven, Inc. ("7-Eleven") and the undersigned
individual(s) (the "Franchisee") hereby mutually
agree that, under that certain 7-Eleven Store
Franchise Agreement between the undersigned
parties, dated march 16, 1999, as amended (the
"Agreement") and terminated effective 6:45 a.m. on
April 15, 2004, and which covered 7-Eleven Store
No. 25955C (the "Store"), except as specifically
provided in Paragraphs 8 and 9 hereof, <u>ALL claims,</u>
demands, rights, duties, guarantees, obligations,
debts, dues, sums of money, accounts, covenants,
contracts, controversies, assignments, suits or
causes of action (collectively, the "claims") <u>of
every kind and nature, however, or wherever
arising, whether known or unknown, foreseen or
unforeseen, direct, indirect, contingent or
actual, liquidated or unliquidated, which have
arisen or which might or could arise under
Federal, state, or local law from any
relationship, incident, or transaction arising or
occurring under the Agreement or under any
agreement in connection therewith, or from the
execution, operation under or termination of the
Agreement, and any services to the franchisee
thereunder or under any prior agreement relating
to the Store, existing or arising at any time
prior to or at the time of the execution hereof,</u>
are hereby mutually satisfied, acquitted,
discharged and released by Franchisee and 7-
Eleven, it being the express intention of
Franchisee and 7-Eleven that this release be as
broad as permitted by law.

(Austin Decl. at Ex. F.)(emphasis added).  It is undisputed that,

at the time Plaintiff signed the Release and Rider, he was aware

that 7-Eleven intended to terminate his franchise without

permitting him to transfer to another 7-Eleven store.  (Aulakh

Depo. at 110.)  Although Plaintiff could have attempted to

enforce the terms of the Franchise Agreement against 7-Eleven, he

instead chose to sign the Release in return for the right to

purchase the real property.  7-Eleven is entitled to summary

judgment on Plaintiff's first two causes of action.

The third cause of action, which alleges that 7-Eleven

breached the <u>Sales Contract</u> by removing the existing gasoline

1  canopy from the Premises, presents a slightly different question.

2  The Sales Contract contains the following provision concerning

3  the gasoline equipment:

4          14.   Removal of Motor Fuels Equipment and Testing

5                Seller has commenced work to remove the Motor
                 Fuels Equipment located on, about or under the
6                Property.  Seller agrees that the gasoline canopy
                 will remain in place at the Property provided that
7                it does not interfere with the removal of the
                 Motor Fuels Equipment.  Seller estimates that the
8                removal, testing and procuring of test results
                 should be completed on or before April 30, 2004.
9                In connection with the removal of the Motor Fuels
                 Equipment, Seller will perform such soil and/or
10               groundwater tests as Seller deems appropriate, and
                 upon request from Buyer will provide Buyer with
11               the results thereof.  If the results of such tests
                 and/or assessments reveal that there is no
12               contamination, then the parties shall proceed with
                 the Closing.  If, however, such tests reveal
13               contamination, Seller shall initiate and complete,
                 at its cost and expense, certain remedial measures
14               as required by the appropriate authorities.  In
                 this instance, the parties may proceed to Closing
15               provided that a mutually-acceptable Access
                 Agreement is executed at the Closing.
16

17  (Austin Decl., Ex. D at ¶ 14.)  It is undisputed that the

18  gasoline canopies were removed _prior_ to the April 15, 2004

19  closing date, the date on which Plaintiff signed the Sales

20  Contract, the Rider, and the Release.  (UMF: Third Count, No. 1.)

21       The Release appears to bar this claim as well because it

22  applies to all claims, "arising or occurring under the Agreement

23  or under any agreement in connection therewith, or from the

24  execution, operation under or termination of the Agreement, and

25  any services to the franchisee thereunder or under any prior

26  agreement relating to the Store, existing or arising at any time

27  prior to or at the time of the execution hereof...."  The Sales

28  Contract is an agreement relating to the Store that was execucated

prior to the signing of the Release.  The canopy removal is
expressly provided for and Plaintiff signed the contract with
full knowledge of the canopy removal.  Although Plaintiff could
have sued to enforce the Sales Contract at any time before
singing the Release, he chose to go forward with the sale.  7-
Eleven is entitled to summary judgment on Plaintiff's third cause
of action.

Accordingly, 7-Eleven's motion for summary judgment is
**GRANTED** as to all of Plaintiff's claims.

### F.   7-Eleven's Counterclaim

7-Eleven also maintains that it is entitled to summary
judgment on its counterclaim for setoff because "no genuine
issues of fact exist." (Doc. 19 at 8.)  7-Eleven oversimplifies
its legal burden on a motion for summary judgment.  Because 7-
Eleven bears the ultimate burden of proof on this claim at trial,
to prevail on summary judgment it must produce evidence
demonstrating that it is entitled to judgment as a matter of law.
*Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (Where
"the moving party bears the burden of proof at trial, it must
come forward with evidence which would entitle it to a directed
verdict if the evidence went uncontroverted at trial."); *cf.
Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore,
unavoidably asks ... whether there is evidence upon which a jury
can properly proceed to find a verdict for the party producing
it, upon whom the onus of proof is imposed.").

7-Eleven points to two pieces of evidence to support its

motion on this claim.  First, the Release explicitly does not apply to "any amounts owing to either party (the 'Final settlement') as reflected on the final Financial Summaries prepared by 7-Eleven." (Release at ¶8.)  7-Eleven also points to Exhibit G to the Declaration of Michael Austin, a one-page spreadsheet purporting to establish that Mr. Aulakh owes 7-Eleven $6,922.35.  But 7-Eleven provides no documents, declarations, or testimony explaining what the figures on this informal spreadsheet mean, how they were calculated, and why Mr. Aulakh should be held financially responsible for the listed sum.[2]  7-Eleven has not met its burden on summary judgment.  Mr. Aulakh's denial is sufficient to make a disputed fact any amount owed by him to 7-Eleven.


### V.   CONCLUSION

     For the reasons set forth above, 7-Eleven's motion for summary judgment is **GRANTED** as to all of Plaintiff's claims.  7-Eleven's motion for summary judgment on its counterclaim is **DENIED**.


**SO ORDERED**

**Dated: January 26, 2006**

                                   **/s/ OLIVER W. WANGER**

                         _____

---

     [2]     For his part, Mr. Aulakh contests 7-Eleven's accounting, "since [he] has not had the chance to have [his] accountant analyze it."  Aulakh Decl. ¶ 13.  Were it not for 7-Eleven's own oversight of proof, Mr. Aulakh's response would be insufficient to defeat 7-Eleven's motion.

**21**

1
                                   OLIVER W. WANGER

2
                     United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28